UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                   :
LIBERTY MUTUAL FIRE INSURANCE CO.,    :
                                   :
                   Plaintiff,        :
                                   :
               v.                 :        17 Civ. 2350 (KPF)
                                   :
HAMILTON INSURANCE CO., formerly known   :       OPINION AND ORDER
as VALIANT INSURANCE CO.,             :
                                   :
                   Defendant.     :
                                   :
------------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

       Two insurance companies — Plaintiff Liberty Mutual Fire Insurance

Company ("Liberty Mutual") and Defendant Hamilton Insurance Company

("Hamilton") — are battling over defense costs incurred in a personal injury

lawsuit (the "Underlying Action"). That lawsuit, which involved grave injuries

to a construction worker, has been resolved, but the allocation of defense costs

remains. In particular, Plaintiff seeks reimbursement from Defendant of

$145,263.30 it paid in defense costs, plus interest at 9% per annum from

December 13, 2013; Defendant disclaims the obligation to pay, and argues in

the alternative that any obligation should be set off by other, arguably related

defense costs incurred by Defendant.

       The parties have filed cross-motions for summary judgment. For the

reasons stated in the remainder of this Opinion, Plaintiff's motion for summary

judgment is granted, and Defendant's motion for summary judgment is denied.

## A. Factual Background

### 1. The Relevant Contracts

The accident in question took place at a construction site in the Bronx that was owned by the Dormitory Authority of the State of New York ("DASNY"). (Com. Ex. 5). DASNY hired Preferred Builders, Inc. ("Preferred") to perform foundation work on the project, which included placing and setting concrete wall panels and wall forms. (Com. Ex. 3; Def. 56.1 ¶ 2). DASNY also retained Gilbane Building Company ("Gilbane") to serve as Construction Manager. (Ham. Ex. A).

DASNY's contract with Preferred required that Preferred obtain insurance coverage naming both DASNY and DASNY's construction manager, *i.e.*, Gilbane, as additional insureds, and specifying that the coverage afforded each additional insured was primary (as distinguished from excess). (Com. Ex. 3, 12). Accordingly, Preferred obtained an insurance policy from Valiant Insurance Company, which later became Hamilton. (Com. Ex. 1). Under that policy (the "Hamilton Policy"), both DASNY and Gilbane were listed as additional insureds. (Com. Ex. 1-3). The Hamilton Policy further recited that

---

[1]    The facts set forth herein are drawn from the parties' Common Exhibits ("Com. Ex." (Dkt. #93)); Hamilton's Exhibits ("Ham. Ex." (Dkt. #52-62, 64-65)); the parties' Rule 56.1 statements ("[Party] 56.1 (Dkt. #46, 94)); the transcript of the deposition testimony of Kevin Follett ("Follet Dep." (Dkt. #45)); and the declaration of Paul Kayata in support of Plaintiff's motion for summary judgment ("Kayata Dep." (Dkt. #44)). For convenience, the Court will refer to Plaintiff Liberty Mutual's memorandum in support of its motion for summary judgment as "Pl. Br." (Dkt. #47); to Defendant Hamilton's opposition memorandum to the same as "Def. Opp." (Dkt. #106); to Defendant Hamilton's memorandum in support of its motion for summary judgment as "Def. Br." (Dkt. #95); and to Plaintiff Liberty Mutual's opposition memorandum to the same as "Pl. Opp." (Dkt. #103). Neither party filed a reply.

"[t]o the extent that this insurance is afforded to any additional insured under this policy, such insurance shall apply as primary and not contributing with any insurance carried by such additional insured, as required by written contract."  (Com. Ex. 1).[2]

DASNY's contract with Gilbane similarly required that Gilbane obtain insurance coverage naming DASNY as an additional insured, for which the policy would provide primary coverage.  (Ham. Ex. A).  Accordingly, Gilbane obtained an insurance policy from Liberty Mutual (the "Liberty Mutual Policy").  (Com. Ex. 4).  As to any additional insured, the Liberty Mutual Policy specified that "[c]overage would be excess of any other valid and collectable insurance *unless the agreement between the insured and additional insured requires this insurance to be primary*."  (*Id*. at 6 (emphasis added)).

As potentially relevant to the instant motions, the Liberty Mutual Policy contained an endorsement providing for a deductible in the amount of $250,000.  (Com. Ex. 4).  Among other things, the endorsement stated: "We [Liberty Mutual] have the right but not the duty to advance any part or all of these amounts.  Exercise of our right to advance such amounts shall not create any obligations or be construed as a waiver or estoppel of our rights under this policy."  (*Id*. at 7).  It further explained that both "damages and supplementary payments erode[d the] deductible."  (*Id*.).  And it defined "supplementary

---

[2]     The Hamilton Policy also stated that "[t]his insurance is primary except when b. below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary[.]"  (Com. Ex. 1).  It is undisputed that no provision of "b" applied in the Underlying Action.  (Pl. Br. 7).

payments" to include "[a]ll expenses we incur" in "any 'suit' against an insured we defend." (*Id.* at 16).

## 2.    The Underlying Action

Angel Siguencia, an employee of Preferred, was injured by a falling concrete wall while working on the site on July 7, 2010. (Com. Ex. 5 at ¶ 23). Preferred was the only contractor working in the area at the time of the accident, and it was Preferred's responsibility to supervise the "means and methods" of its employees' work. (Def. Br. 5; Ham. Ex. D at 17-21).

On June 21, 2011, Siguencia filed the Underlying Action in the Supreme Court of the State of New York, Bronx County, against DASNY and Gilbane, among others, but did not name Preferred as a defendant. *See Siguencia* v. *Gilbane, et al.*, Index No. 305543/2011. (Com. Ex. 5). DASNY cross-claimed against Gilbane and also commenced a third-party action against Preferred. (Com. Ex. 6, 8). Gilbane, which was defended by the law firm Marshall Dennehey Warner Coleman & Goggin ("Marshall Dennehey"), both cross-claimed against Preferred and brought an additional third-party action against Preferred. (Com. Ex. 7, 8; *see also* Pl. Br. 12 n.7 (explaining reasons for the third-party action)). Defendant Hamilton, the insurer for Preferred, stepped in to defend and appoint counsel for Preferred. (Follet Dep. 28).

## 3.    The Insurance Coverage Disputes

### a.    Gilbane's Tenders of Defense and Coverage

On January 3, 2011, on July 25, 2011, and on September 12, 2013, Gilbane's counsel, Marshall Dennehey, thrice tendered Gilbane's defense,

indemnification, and additional insured status in the Underlying Action to Hamilton, via Hamilton's claims management agent, Riverstone. (Com. Ex. 12, 17).[3] The January 3, 2011 letter stated, in relevant part:

> [W]e are tendering the defense and indemnification of the claims against Gilbane to your company as the General Liability Carrier for Preferred. Gilbane does hereby tender its defense ... and requests that it be indemnified and that the costs of its defense be immediately assumed[.] Absent resolution of this tender within thirty (30) days, Gilbane may seek to enforce its rights and move to compel the assumption of its defense pursuant to the contractual obligation of Preferred to Gilbane.

(Com. Ex. 11). Notably, the January 3, 2011 letter was sent before Siguencia brought the Underlying Action on June 21, 2011, and the letter accordingly refers to the Underlying Action as "pre-suit." (Com. Ex. 5, 11). According to a subsequent description by Liberty Mutual's agent, Hamilton "responded by saying that [it] opened a file to investigate the tender." (Com. Ex. 12). Marshall Dennehey's July 25, 2011 letter stated similarly:

> [W]e are tendering the defense and indemnification and additional insured status of the claims against Gilbane to your company as the General Liability Carrier for Preferred. Gilbane does hereby tender its defense to [Hamilton] ... and requests that it be indemnified and that the costs of its defense be immediately assumed.... We ask that you respond to this demand immediately[.]

(*Id.*).

On October 21, 2011, Hamilton denied coverage for Gilbane on the basis that there was no direct contractual privity between Gilbane and Hamilton's

---

[3] It is undisputed that Riverstone was Hamilton's authorized agent and claims administrator. (Com. Ex. 13).

policyholder, Preferred.  (Follett Dep. 54-55, 58).  Approximately two years later, on October 11, 2013, Hamilton reversed course and "agreed to assume Gilbane's defense under a full reservation of rights," by which Hamilton meant that it: (i) "reserve[d] the right to appoint new defense counsel" for Gilbane; (ii) the "insured status applies only to the extent the liability of the additional insured arises out of Preferred Builders' work"; and (iii) Hamilton "reserve[d] the right to disclaim coverage for any liability assessed against Gilbane that falls outside this [coverage limitation]."  (Com. Ex. 17).  On January 14, 2014, Hamilton reasserted both its "agreement to defend Gilbane," and its reservation of rights, noting that "Gilbane's additional insured coverage is limited to its liability arising from the work of [Hamilton's] named insured, Preferred Builders[.]"  (Com. Ex. 18).  Neither of these letters mentioned a duty to indemnify, only to defend.  (Com. Ex. 17, 18; Kayata Decl. ¶ 21).

In discussions that took place following the October 11, 2013 letter, Hamilton's agent indicated an intent to replace Gilbane's counsel, Marshall Dennehey, with counsel of Hamilton's choosing.  (Kayata Decl. ¶ 20).  Liberty Mutual resisted on the basis that Hamilton was subject to a potential conflict of interest, which conflict flowed from the combination of Hamilton's existing representation of Preferred and its recently-expressed position limiting Gilbane's coverage to harm caused by Preferred's negligence.  The simultaneous representations, it was argued, might lead Hamilton to characterize the accident as caused solely by Gilbane's negligence.  (Kayata Decl. ¶ 21; Com. Ex. 19).  Arguably substantiating these concerns, on

January 14, 2014, Hamilton requested, unsuccessfully, that Gilbane "dismiss the third party complaint that [Gilbane] recently served upon Preferred in order to avoid additional, unnecessary costs for all." (Com. Ex. 18).

In mid-2014, Hamilton hinted at a retreat from its reservation of rights. On June 11, 2014, an attorney for Hamilton, Michael Buckley, emailed Liberty Mutual's Senior Technical Claims Specialist, Paul Kayata, stating: "this email will confirm that my client, [Hamilton], will accept the defense of Gilbane at this point in time, going forward through trial and appeal if necessary, without any limitation. This should also moot the third party claim against Preferred Builders." (Com. Ex. 21). That same day, June 11, 2014, Mr. Kayata requested a "formal coverage opinion letter" from Mr. Buckley amending the prior coverage position statements of October 11, 2013, and January 14, 2014, to clarify the sequencing of Preferred's excess coverage provisions. (*Id.*). No such letter arrived. (Kayata Decl. ¶ 24). Hamilton's representative witness later testified that Mr. Buckley was not "authorized to make final claims decisions on behalf of Hamilton for the Siguencia matter … [or] to issue coverage position letters," and that, while Hamilton had agreed to defend Gilbane, it had never agreed to indemnify Gilbane. (Follett Dep. 99, 126).

### b.      The Duty to Defend DASNY

Before the Underlying Action was filed, DASNY had made a pre-action request to Liberty Mutual for additional insured status, which Liberty Mutual "denied as premature." (Ham. Ex. E, J). By letter dated January 28, 2011, Liberty Mutual explained that, "[u]nless and until the claimant commences a

'suit,' we are not obligated to provide a defense." (Ham. Ex. J). Liberty Mutual acknowledged that DASNY "potentially qualifie[d] as an additional insured under the [Liberty Mutual P]olicy," but maintained that the Liberty Mutual coverage was "limited to liability for 'bodily injury' … caused in whole or in part by the named insured's acts or omissions," and that the Liberty Mutual "coverage is excess over any other additional insured coverage afforded to [DASNY]." (*Id.*). Based on information it had received about the accident, Liberty Mutual expressed the view that Siguencia's injury was not "caused in whole or in part by the acts or omissions of Gilbane Building Company or those acting on its behalf"; that "it does not appear that Gilbane Building Company had anything to do with the loss"; and thus that DASNY would not be covered against a claim arising from that incident. (*Id.*).

On October 15, 2013, Hamilton demanded that Liberty Mutual cover DASNY's defense costs on a *pro rata* basis. (Ham. Ex. L). Hamilton asserted that, per DASNY's contract with Gilbane, the Liberty Mutual Policy provided primary insurance coverage for DASNY and, further, that as Siguencia's complaint alleged that Gilbane's negligence contributed to the injury, Liberty Mutual had a duty to defend DASNY. (*Id.*). DASNY formally tendered its defense to Liberty Mutual on June 27, 2014, on the basis that "Plaintiff's summons and complaint alleges direct claims against Gilbane for negligence[.]." (Ham. Ex. E). The parties do not dispute that Liberty Mutual "refused to defend DASNY." (Def. 56.1. ¶ 52).

On November 13, 2014, Siguencia settled the Underlying Action for $2.5 million. (Com. Ex. 10). Hamilton, on behalf of its insured Preferred, paid the $1 million limit of its policy, and Preferred's excess insurer paid the remaining $1.5 million. (Pl. 56.1 ¶¶ 57-58). Liberty Mutual did not contribute to the settlement, but did pay $145,263.30 for Gilbane's legal defense. (*Id.* at ¶ 59).

## B.    Procedural Background

Liberty Mutual brought this action against Hamilton on March 31, 2017, to recover the costs that Liberty Mutual incurred to defend Gilbane in the Underlying Action, plus interest. (Dkt. #1). In March 2018, the parties cross-moved for summary judgment. (Dkt. #42, 89, 93). Both parties' opposition briefs were filed in April 2018. (Dkt. #103, 106).

## DISCUSSION

## A.    Applicable Law

### 1.    Summary Judgment Motions

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[4] A fact is "material" if it "might affect the outcome of the suit under the

---

[4]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor."  *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a *genuine issue for trial.*"  *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted).  The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

Local Civil Rule 56.1 requires that the movant file a "short and concise statement ... of the material facts as to which the moving party contends there is no genuine issue to be tried" and each proffered fact will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph[.]"  Local Civ. R. 56.1(a)-(c).  Each statement must be supported by a citation to admissible evidence.  *Id.* at 56.1(d).  But a reviewing court "may not rely solely on the statement of undisputed facts[,] ... [i]t must be satisfied that the citation

to evidence in the record supports the assertion." *Vt. Teddy Bear Co.*, 373 F.3d at 244 (citing *Giannullo* v. *City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)). A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Simpson* v. *City of N.Y.*, 793 F.3d 259, 265 (2d Cir. 2015). It is not appropriate for the Court to make credibility assessments or resolve conflicting versions of the events presented — these are essential questions for a jury. *Id.*

## 2.     Interpretation of Insurance Contracts Under New York Law

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." *Porco* v. *Lexington Ins. Co.,* 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) (quoting *In re Estates of Covert,* 97 N.Y.2d 68, 76 (2001) (internal quotation marks omitted)). Under New York law, the interpretation of a contract "is a matter of law for the court to decide." *Int'l Multifoods Corp.* v. *Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir. 2002) (internal citation omitted); *see also Parks Real Estate Purchasing Grp.* v. *St. Paul Fire and Marine Ins. Co.,* 472 F.3d 33, 42 (2d Cir. 2006) ("[T]he initial interpretation of a contract is a matter of law for the court to decide." (internal quotation marks and citation omitted)).

The Court must interpret unambiguous contractual provisions in light of "'their plain and ordinary meaning.'" *10 Ellicott Square Court Corp.* v. *Mountain Valley Indem. Co.,* 634 F.3d 112, 119 (2d Cir. 2011) (quoting *Essex Ins. Co.* v. *Laruccia Constr., Inc.*, 898 N.Y.S.2d 558, 559 (2d Dep't 2010)). The Court must

interpret such terms "in light of 'common speech' and the reasonable expectations of a businessperson." *Belt Painting Corp.* v. *TIG Ins. Co.,* 100 N.Y.2d 377, 383 (2003) (internal citation omitted). "Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate.... Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly." *Palmieri* v. *Allstate Ins. Co.,* 445 F.3d 179, 187 (2d Cir. 2006) (internal quotation marks and citations omitted).

If a contract term is "susceptible to at least two reasonable interpretations," summary judgment is inappropriate because the meaning of an ambiguous contract term is "generally an issue of fact, requiring the trier of fact to determine the parties' intent." *U.S. Naval Inst.* v. *Charter Commc'ns, Inc.,* 875 F.2d 1044, 1048 (2d Cir. 1989) (internal citations omitted). In contrast, if the contractual terms are unambiguous, the dispute is properly resolved on summary judgment, and the court must "give effect to the intent of the parties as expressed in the clear language of the contract." *Mount Vernon Fire Ins. Co.* v. *Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002) (internal quotation marks and citation omitted).

### 3. The Duty to Defend

The New York Court of Appeals has described the duty to defend as follows:

> [A]n insurance company's duty to defend is broader than its duty to indemnify. Indeed, the duty to defend

> is exceedingly broad and an insurer will be called upon
> to provide a defense whenever the allegations of the
> complaint suggest a reasonable possibility of coverage.
> If, liberally construed, the claim is within the embrace
> of the policy, the insurer must come forward to defend
> its insured no matter how groundless, false or baseless
> the suit may be.

*Automobile Ins. Co. of Hartford* v. *Cook*, 7 N.Y.3d 131, 137 (2006) (internal

quotation marks and citations omitted).  "The duty [to defend] remains even

though facts outside the four corners of [the] pleadings indicate that the claim

may be meritless or not covered."  *Id.* (internal quotation marks and citation

omitted).  "[T[he insurer will be required to provide a defense unless it can

demonstrate that the allegations of the complaint cast that pleading solely and

entirely within the policy exclusions, and, further, that the allegations, in toto,

are subject to no other interpretation."  *Id.* (internal quotation marks and

citations omitted).[5]

## B.    Analysis

### 1.    Liberty Mutual's Claim Is Timely

As a threshold matter, Hamilton seeks dismissal of Liberty Mutual's

claim as untimely.  New York law imposes a six-year limitations period for

---

[5]    The remaining cases cited by the parties on the duty to defend provide little clarification
of the relevant issues.  In *K2 Investment Group, LLC* v. *American Guarantee & Liability
Insurance Co.*, 22 N.Y.3d 578 (2014), the New York Court of Appeals held that an
insurer's breach of its duty to defend does not bar it from relying on policy exclusions
not at issue in the underlying action in order to resist a duty to indemnify.  *Id.* at 585-
87.  And in *Lang* v. *Hanover Insurance Co.*, 3 N.Y.3d 350 (2004), that same court
considered whether an injured party may seek a declaratory judgment against an
insurer.  *Id.* at 354-55.  The *Lang* Court observed in dicta that an insurance company
that disclaims a duty to defend, and thus does not participate in an underlying action
against its purported insured, may not subsequently challenge the liability or damages
determination in the underlying action.  *Id.* at 356.

breach of contract claims. N.Y. C.P.L.R. § 213. Liberty Mutual filed this action on March 31, 2017. (Dkt. #1). Therefore, for the action to be timely, the claim must not have accrued prior to March 31, 2011.

Liberty Mutual argues that its claim did not accrue until the Underlying Action terminated, which occurred via settlement on November 13, 2014, well within the limitations period. (Pl. Opp. 6). For this proposition, Liberty Mutual relies on *Ghaly* v. *First Am. Title Ins. Co.*, 644 N.Y.S.2d 770 (2d Dep't 1996), in which the Second Department held that "[a] cause of action based on an insurer's alleged breach of a contractual duty to defend accrues only when the underlying litigation brought against the insured has been finally terminated and the insurer can no longer defend the insured even if it chooses to do so." *Ghaly*, 644 N.Y.S.2d at 771.

In contrast, Hamilton argues that the claim accrued "when Liberty Mutual became aware of their claim against Valiant and had a right to demand payment for their defense costs." (Def. Br. 8). That is, Liberty Mutual must have been aware of its right to demand payment at least by the time Gilbane first tendered its defense to Hamilton on January 3, 2011, substantially outside the limitations window. (*Id.* at 9). Unfortunately for Hamilton, it relies on a New York Court of Appeals decision that clearly cabins its reasoning to the terms of the particular insurance contracts at issue in that dispute. *See Hahn Automotive Warehouse, Inc.* v. *American Zurich Ins.*, 18 N.Y.3d 765, 767 (2012) ("*Under the terms of the insurance contracts in this case*, we conclude that the counterclaims accrued when the insurers had the right to demand payment."

(emphasis added)). *Ghaly* makes clear that, under New York law, a claim for failure to defend accrues when the underlying action terminates. Liberty Mutual's action is therefore timely.

### 2. Hamilton Owed Gilbane a Duty to Defend

As noted, to determine whether the insurer has a duty to defend, courts assess whether the complaint in the underlying action could conceivably state a claim that would be covered under the insurer's policy. "Whether an insurer has a contractual obligation to defend an action against its insured is a determination of law to be made by comparing the allegations of the complaint with the provisions of the insurance policy[.]" 70A N.Y. Jur. 2D Insurance § 2122. "[T]he insurer must defend whenever allegations within the four corners of the complaint suggest ... a reasonable possibility of coverage." *Id*.

Here, the complaint in the Underlying Action alleged that Gilbane was the "general contractor" for DASNY's construction project, and that Siguencia was injured by a falling concrete wall panel at the construction site. (Com. Ex. 5). Specifically, the Complaint alleged that "the device being used to ... move the concrete form ... and other devices, were not constructed, placed, equipped, used and provided, and same were not operated or conducted so as to provide reasonable and adequate protection and safety to the Plaintiff, who was an employee at the site." (*Id*.). There is no dispute that Siguencia was an employee of Preferred; that Preferred was hired to place and set the concrete wall forms; that the injury occurred at a time when Preferred was the only contractor working in the area; and that Preferred bore the responsibility to

15

supervise the means and methods of its employees' work.  (Com. Ex. 3, 5; Ham. Ex. D 17-21, 122).

The Hamilton Policy issued to Preferred included an endorsement naming, as an additional insured, "[a]ny Person or organization [Preferred] agreed to add as additional insured by written contract, prior to an 'occurrence' or offense."  (Com. Ex. 1).  For that additional insured, the Hamilton Policy provided primary coverage "only with respect to liability arising out of '[Preferred's] work' for that insured by or for [Preferred]."  (*Id*.).  Neither party disputes the classification of Siguencia's injury as arising out of Preferred's work.

Rather, as Hamilton's representative witness testified, Hamilton initially denied Gilbane's tender because Hamilton determined that the Policy's "additional insured endorsement required a separate contract" between Preferred and Gilbane.  (Follett Dep. 54-55).  Hamilton did not dispute that Preferred's contract with DASNY "agreed to include the construction manager, which was Gilbane, as an additional insured."  (*Id*. at 58).  On subsequent review, Hamilton determined that the language of the endorsement in this case did not require a separate "contract between a named insured and an additional insured."  (*Id*. at 55).  In other words, Preferred's contract with DASNY was sufficient to trigger the additional insured endorsement coverage for Gilbane under the Hamilton Policy.

Given the lenient standard that any reasonable possibility of coverage activates a duty to defend, the Court has little difficulty concluding that

Hamilton owed Gilbane such a duty. The Court recognizes that Hamilton agreed to assume Gilbane's defense with a full reservation of rights, and thereby retained the ability to contest any duty to indemnify Gilbane. However, the Court need not decide whether Hamilton was obliged to indemnify Gilbane against Siguencia's claims; this action concerns only Hamilton's duty to defend Gilbane in the Underlying Action. Hamilton was "required to provide a defense unless it [could] demonstrate that the allegations of [Siguencia's] complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation." *Automobile Ins. Co. of Hartford*, 7 N.Y.3d at 137 (internal citation and quotation marks omitted). Hamilton has not established that it could make such a demonstration, and indeed, its waffling responses to Gilbane's tenders suggests otherwise. The Court finds that Hamilton owed Gilbane a duty to defend.

### 3. Gilbane's Refusal to Replace Its Counsel with Counsel Selected by Hamilton Did Not Absolve Hamilton of Its Duty to Defend

Hamilton protests that any obligation to defend on its part was waived by Gilbane's conduct, including in particular Gilbane's refusal to accept a defense from Hamilton that included a right to replace Marshall Dennehey as Gilbane's counsel. The issue is whether this refusal was justified. Ultimately, the Court finds that it was.

"[A]n insurer's wrongful refusal to defend causes the insurer to forfeit its right to control the underlying litigation[.]" 31 N.Y. PRAC., NEW YORK INSURANCE LAW § 31:36 (2017-2018 ed.); *see also Isadore Rosen & Sons, Inc.* v. *Security Mut. Ins. Co. of New York*, 31 N.Y.2d 342, 348 (1972) ("The New York rule is

that where an insurer unjustifiably refuses to defend a suit, the insured may make a reasonable settlement … and is then entitled to reimbursement from the insurer, even though the policy purports to avoid liability for settlements made without the insurer's consent." (internal citation and quotation marks omitted)).  This forfeiture of the insurer's right to control the insured's defense is all the more clear when a conflict of interest exists between the insurer and the insured.  As but one example, in *Wiley* v. *New York Central Mutual Fire Insurance Company*, 620 N.Y.S.2d 592 (3d Dep't 1994), following a declaratory judgment that the insurer had breached its duty to defend, the insurer sought to replace the insureds' existing counsel with new counsel of the insurer's choosing.  *Id.* at 592-93.  The Third Department explained that the insurer had "lost the right to control the action" through its breach of the duty to defend; that there was a conflict of interest between the insurer and the insureds; and that the insureds were "entitled to a defense by an attorney of their own choosing, particularly in light of [the insurer's] unjustified refusal to defend them in the underlying action from the outset."  *Id.* at 593 (internal citations omitted).

As in *Wiley*, Hamilton initially breached its duty to defend Gilbane, and then sought to replace Gilbane's counsel.  Hamilton now argues that when on October 11, 2013, it finally agreed that it had a duty to assume Gilbane's defense, and did so with a full reservation of rights, it had the right to choose Gilbane's counsel.  (Com. Ex. 17; Def. Br. 11).  Because Liberty Mutual resisted Hamilton's offer due to concerns over Hamilton replacing Gilbane's counsel,

18

Hamilton requests that its liability for Gilbane's defense fees and cost "be cut[ ]off as of October 11, 2013." (Def. Br. 13). Liberty Mutual argues, in response, that the 2013 offer was unacceptable, as Hamilton had no right to choose Gilbane's counsel for at least three reasons: (i) the reservation of rights; (ii) an arguable conflict of interest between Hamilton and Gilbane; and (iii) the specter of prejudice had Gilbane been forced to change counsel more than two years into the Underlying Action. (Pl. Br. 15-18).

Before examining these three issues, the Court pauses to address the rather curious assertion by Hamilton that it "did not *require* Gilbane to change counsel at all." (Def. Br. 16 (emphasis added)). Hamilton states that, in fact, on October 11, 2013, it offered "to defend Gilbane with the *same counsel* (Marshall Dennehey)". (*Id.* (citing Com. Ex. 17)). Were this assertion factually correct, it would seem to negate arguments advanced by both parties. As it happens, it is entirely contradicted by the record. Hamilton's October 11, 2011 letter states unequivocally, "[Hamilton] reserves the right to appoint new defense counsel[.]" (Com. Ex. 17). No reasonable fact finder could interpret that statement to mean that Hamilton was offering to defend Gilbane using Gilbane's existing counsel. The Court is disappointed that Hamilton would argue otherwise.

### a.    Reservation of Rights

Regarding the issue of reservation of rights, Hamilton argues, correctly, that an insurer does not waive the right to control the insured's defense merely by undertaking the duty to defend with a full reservation of rights. (Def.

Br. 10-11). *See Law Offices of Zachary R. Greenhill P.C.* v. *Liberty Ins. Underwriters, Inc.*, 9 N.Y.S.3d 264 (1st Dep't 2015) (holding that "[t]he issuance of a reservation of rights allows the insurer the flexibility of fulfilling its obligation to provide its insured with a defense, while continuing to investigate the claim further"). Liberty Mutual argues to the contrary that a full reservation of rights regarding a duty to indemnify generally does require waiver of the insurer's right to control the defense and choose counsel. (Pl. Br. 16). However, in making this assertion, Liberty Mutual engages in selective quotation from a sister court in this District; the full quote undermines Liberty Mutual's argument:

> An insurer's reservation of rights does not automatically entitle its insured to representation of its choice at the insurer's expense. Instead, the insured's right to independent counsel is only triggered when the reservation of rights creates a potential conflict of interest for the counsel provided by the insurer, and in particular, where the defense attorney's duty to the insured would be to defeat liability on *any* ground but his duty to the insurer would be to defeat liability on *only those* grounds for which the insurer might be liable.

*Executive Risk Indem. Inc.* v. *Icon Title Agency*, 739 F. Supp. 2d 446, 450 (S.D.N.Y. 2010). In other words, it is conflict, not the mere reservation of rights, that may strip the insurer of its right to choose counsel for the insured.[6]

---

[6]    Liberty Mutual also cites *First Jeffersonian Associates* v. *Insurance Co. of North America*, 691 N.Y.S.2d 506 (1st Dep't 1999). (Pl. Br. 16). That decision does state that, "inasmuch as defendant's subsequent offer to defend was conditioned on a reservation of rights with respect to its obligation to indemnify, [the insured] was at all times entitled to counsel of its own choosing[.]" *Id.* at 507. However, *First Jeffersonian Associates* derives this proposition mistakenly from *Public Service Mutual Insurance Co.* v. *Goldfarb*, 53 N.Y.2d 392, 401 (1981), which, as explained in the text, *infra*,

### b.    Conflict of Interest

In *Public Service Mutual Insurance Co.* v. *Goldfarb*, the Court of Appeals held that, if a conflict exists because "the insurer [is] liable only upon some of the grounds for recovery asserted and not upon others — defendant … is entitled to defense by an attorney of his choosing, whose reasonable fee is to be paid by the insurer."  53 N.Y.2d 392, 401 (1981).  Liberty Mutual argues from this decision that Hamilton had no right to choose Gilbane's counsel because of a conflict of interest whereby Hamilton "would be liable only on some of the grounds for which recovery was sought in the Underlying Action," *i.e.*, "only to the extent the liability … arises out of Preferred Builders' work."  (Pl. Br. 16; Com. Ex. 17).  It posits that this limitation on Hamilton's liability created a conflict:  Hamilton "would not only be less interested in defending liability arising from Gilbane's work; it would want to show that liability arose solely from Gilbane's work — increasing Gilbane's exposure and eliminating Hamilton's exposure both as insurer of Gilbane and as insurer of Preferred." (Pl. Br. 16-17).  In addition, Liberty Mutual notes that "Gilbane had cross-claims against and from DASNY, Hamilton's additional insured, and a third-party action for indemnification against Preferred, Hamilton's Named Insured." (*Id.* at 17).

Hamilton contends that the issue of conflict "is irrelevant" because, by the time it finally undertook Gilbane's defense, there was no more conflict.

established that it is a conflict of interest — and not merely a reservation of rights — that informs the control-of-counsel inquiry.

(Def. Br. 11-12, 16).  Specifically, by October 11, 2013, there was no longer any dispute "that Preferred Builders was … *solely* responsible for Siguencia's injury"; that Preferred had no plausible claim against Gilbane; and that Gilbane's sole liability flowed from the negligence of its sub-contractor, Preferred.  (Def. Br. 11-12).  Hamilton also asserts that Liberty Mutual was aware of the absence of conflict no later than January 28, 2011, and thus had no basis to refuse Hamilton's October 11, 2013 acceptance of the tender of defense.  (*Id.* at 13).  In any event, Hamilton claims, even before the determination of Preferred's sole liability, Hamilton could have obviated the issue by appointing different counsel for Gilbane, which counsel would have been ethically bound to defend Gilbane against all claims independent of Hamilton's coverage position.  (*Id.* at 13-16).

The Court agrees with Liberty Mutual.  Even if the Court could plausibly determine that the conflict posed by the limitations on Hamilton's liability had evaporated by 2013, Gilbane's cross-claim and third-party action persisted.  "A further justification for representation by attorneys selected by the insureds exists in the instant case by reason of the claims and cross claims of the respondents.…  The cross claims indicate true adversity and conflict of interest[.]"  *Rimar* v. *Cont'l Cas. Co.*, 376 N.Y.S.2d 309, 313 (4th Dep't 1975).  Here, the specter of conflict from the cross-claims and third-party action loomed larger due to Hamilton's repeated, and unsuccessful, attempts to persuade Gilbane to drop those claims.  (*See* Com. Ex. 21).  Under these circumstances, the apparent conflict of interest between Hamilton and Gilbane

entitled Gilbane to counsel of its own choosing.  Thus, Gilbane's refusal to accept Hamilton's offer of defense under the condition of a change of counsel did not absolve Hamilton of its duty to defend.

### c.    Breach and Delay

The Court concludes that Hamilton remained obligated to defend Gilbane for a separate reason:  Hamilton's initial breach of its duty to defend, and its years'-long delay in rectifying that breach before stepping in to assist, waived its right to appoint Gilbane's counsel.  *See, e.g.*, *Wiley*, 620 N.Y.S.2d at 593. Hamilton attempts to evade this conclusion by arguing that Gilbane would not have been prejudiced by having to switch counsel more than two years into the lawsuit because it could have elected to use DASNY's counsel, which had been involved in the matter from the commencement of the Underlying Action, and because the issues in the Underlying Action were so basic that new counsel could have gotten up to speed rapidly.  (Def. Br. 16-17).

The notion that Gilbane could have selected DASNY's counsel is, once again, belied by the record.  As stated above, Hamilton's October 11, 2011 letter is unequivocal that, "[Hamilton] reserves the right to appoint new defense counsel[.]"  (Com. Ex. 17).  Nothing in that letter indicates that Gilbane could choose DASNY's counsel, which counsel would in any event have been conflicted due to DASNY's cross-claim against Gilbane.  And Hamilton's suggestion that Gilbane would not have been prejudiced by the switch to entirely new counsel is wholly unpersuasive:  Marshall Dennehey had represented Gilbane through years of litigation; Gilbane undoubtedly would

have been prejudiced if it had had to retain new counsel at so late a stage in the proceedings.

The Court concludes that Hamilton was liable for Gilbane's defense fees and costs throughout the entirety of the Underlying Action, and that Gilbane's 2013 refusal of Hamilton's belated (and conditional) offer to defend does not terminate that liability. Absent a basis for reduction, Liberty Mutual is entitled to recover from Hamilton the full amount of costs that it incurred in defending Gilbane, plus interest.

**4.      Hamilton Is Not Entitled to a Set-Off for the Costs It Expended in Defending DASNY**

Hamilton argues that a basis for reduction exists — namely, a set-off for the defense costs that Hamilton expended on DASNY. To review, DASNY's contract with Preferred required that Preferred obtain insurance coverage naming both DASNY and Gilbane as additional insureds (which was accomplished in the Hamilton Policy), while DASNY's contract with Gilbane required that Gilbane obtain insurance coverage naming DASNY as an additional insured (which was accomplished in the Liberty Mutual Policy). (Com. Ex. 1-4, 12; Ham. Ex. A). Separate and apart from the dispute over Hamilton's duty to defend Gilbane, this case also presents an issue as to Liberty Mutual's duty to defend DASNY.

It is both undisputed and correct that DASNY qualified as an additional insured under Preferred's Hamilton Policy, which stated that "[t]o the extent that this insurance is afforded to any additional insured under this policy, such insurance shall apply as primary[.]"  (Com. Ex. 1, 2). Gilbane's Liberty

24

Mutual Policy also contained a provision for additional insureds. (Com. Ex. 4). However, the parties disagree as to whether DASNY qualified as an additional insured under the Liberty Mutual Policy and, if so, whether Liberty Mutual's coverage for DASNY was co-primary or in excess of Hamilton's coverage for DASNY.

### a. Co-Primary Versus Excess Coverage

Hamilton argues that both it and Liberty Mutual owed DASNY a duty to defend, that Liberty Mutual refused DASNY's tender, and that Hamilton is thus entitled to a set-off for its costs incurred in defending DASNY. (Def. Br. 17). Liberty Mutual maintains in the first instance that any duty to defend that it owed to DASNY — of which it admits none — would merely have obliged it to provide excess coverage. It points to the "Other Insurance" provision of its policy, which states: "Coverage would be excess ... unless the agreement between the insured and additional insured requires this insurance to be primary." (Com. Ex. 4). Liberty Mutual claims that the coverage is excess because no contract exists in which Gilbane agreed to "provide DASNY with insurance primary as compared to the insurance coverage provided to DASNY as an additional insured by Preferred." (Pl. Br. 24-25).

Liberty Mutual's position is belied by the record. As Hamilton points out, the terms of Gilbane's Liberty Mutual policy guaranteed co-primary coverage to DASNY as an additional insured. (*See* Def. Br. 19). DASNY and Gilbane entered into a contract that required Gilbane to obtain coverage naming DASNY as an additional insured, and required as well that the policy "be

endorsed to be primary as respects the coverage afforded the Additional Insureds[.]" (Ham. Ex. A2). There is nothing ambiguous about this provision, or about the language in the Liberty Mutual Policy stating that coverage for additional insured is excess "unless" the contract between DASNY and Gilbane "requires this insurance to be primary," which it does. *See DD 11th Ave., LLC v. Harleysville Ins. Co. of N.Y.*, 12 N.Y.S.3d 48, 49 (1st Dep't 2015) (holding that an insurer owed primary coverage where the policy's "additional insured endorsement specifically provides that 'any coverage ... to an additional insured shall be excess ... unless the 'written contract' specifically requires that this insurance be primary ...' and [the named insured] expressly contracted to provide ... primary coverage"). Accordingly, the Court finds that Liberty Mutual owed a co-primary duty to defend DASNY in the Underlying Action.

### b.      The Purported Agreement to Contribute

As a separate justification for a set-off, Hamilton argues that "the Liberty Mutual adjuster agreed to contribute on a *pro rata*, co-primary basis." (Def. Br. 19). For support, Hamilton points to a March 31, 2015 email from Liberty Mutual's claims adjuster, Paul Kayata, to Hamilton, stating that Liberty Mutual was seeking reimbursement of its costs incurred to defend Gilbane, "less 50% of ... [Hamilton's] costs to defend DASNY." (Ham. Ex. M).

Even were it appropriate for the Court to consider this email — and it is not, *see* Fed. R. Evid. 408 — the Court is not persuaded by Hamilton's reasoning. The email on which Hamilton relies does not establish that Liberty Mutual conceded an obligation to pay 50% of the DASNY defense costs, as

opposed to an offer to do so to facilitate collection of its claim against Hamilton for the costs of Gilbane's defense. In an earlier email exchange dated March 18, 2015, Kayata asserted that Liberty Mutual's official position was that Hamilton was required "to pay the full costs to defend this case." (Ham. Ex. M). There is no indication of a change of position as to coverage; Liberty Mutual appears merely to offer to share the costs of DASNY's defense to facilitate settlement of its claim for the costs of Gilbane's defense.

### c. The $250,000 Deductible

The terms of the Liberty Mutual Policy, combined with the terms of DASNY's contract with Gilbane, obliged Liberty Mutual to provide co-primary coverage for DASNY's defense. In theory, therefore, Liberty Mutual should share the defense costs advanced by Hamilton to DASNY. Liberty Mutual seeks to escape this conclusion with two arguments, one of which proves to be successful.

*First*, Liberty Mutual maintains that it has no obligation to pay for DASNY's defense costs because those costs fall within the Liberty Mutual Policy's $250,000 deductible for "supplementary payments," which are the responsibility of the insured. (Pl. Br. 19-20). In Liberty Mutual's view, its obligation to defend DASNY would not apply until the costs of the defense exceeded the deductible amount, which has not occurred. (*Id.* at 20-21).[7]

---

[7] Liberty Mutual also argues that, due to the deductible, DASNY was effectively "self-insured" to the extent that its defense expenses remained less than $250,000. (Pl. Br. 22). It argues that this "[s]elf-insurance" does not qualify as "other insurance" that could be co-primary with coverage from Hamilton. (*Id.*). The Court has already determined that DASNY's contract with Gilbane required Gilbane to obtain primary insurance coverage, and that Liberty Mutual's policy assumed that obligation. As such,

Hamilton rejoins that the $250,000 deductible "is irrelevant" because Liberty Mutual was obliged to provide "primary" coverage for DASNY, an obligation that Hamilton contends would be breached were Hamilton to bear the sole responsibility for the first $250,000 of DASNY's defense. (Def. Br. 22). Put differently, Hamilton's position is that the existence of the deductible breaches Liberty Mutual's obligation to provide primary coverage.

Liberty Mutual has the better of the argument. "[I]n establishing a pecking order among multiple insurers covering the same risk … [New York case law has] recognized the right of each insurer to rely upon the terms of its own contract with its insured." *State Farm Fire & Cas. Co.* v. *LiMauro*, 65 N.Y.2d 369, 372-73 (1985). Accordingly, Liberty Mutual is entitled to rely on the terms of its contract with DASNY, which exclude coverage for the first $250,000 in costs. To force Liberty Mutual to pay costs of DASNY's defense prior to the exhaustion of that $250,000 deductible would contravene the plain meaning of its contract with DASNY. To be sure, an insurer

> is obligated to reimburse [another insurer] for half of its costs in defending … the parties' mutual insured … pursuant to identical "other insurance" provisions contained in the parties' general liability insurance policies, *which are identical* and insure against the same risk, thereby requiring each insurer to contribute in proportion to its limit amount of insurance.

*Philadelphia Indem. Ins. Co.* v. *Harleysville Ins. Co.*, 967 N.Y.S.2d 91, 92 (2d Dep't 2013) (internal citation and quotation marks omitted) (emphasis added).

---

the Court rejects the notion that the existence of a deductible means that the Liberty Mutual policy is not primary.

Yet here, the relevant provisions of the Liberty Mutual and Hamilton Policies were not identical; Liberty Mutual's had a deductible and Hamilton's did not.

### d.    The Anti-Subrogation Rule

*Second*, Liberty Mutual submits that the "anti-subrogation rule" bars Hamilton from asserting any right of set-off.  (Pl. Br. 21-22).  This time, the Court disagrees.

The rule of subrogation provides that "an insurer that has paid a claim on behalf of an insured who is only vicariously liable for the loss is entitled to recover the amount paid by way of indemnity from the wrongdoer." *North Star Reinsurance* v. *Continental*, 82 N.Y.2d 281, 291 (1993).  "Although an insurance company that has indemnified its insured is entitled to subrogation against the tortfeasor responsible for the loss, the insurer has no right of subrogation against its own insured." *Judge Motor Corp.* v. *Graham*, 534 N.Y.S.2d 303, 303 (4th Dep't 1988).[8]

Liberty Mutual argues that the anti-subrogation rule should preclude Hamilton from seeking a set-off against Liberty Mutual where, due to the deductible, the cost of the set-off would effectively be passed on to Hamilton's own named insured.  (Pl. Br. 22).  For support, Liberty Mutual points to

---

[8]    *See generally Maheu* v. *Long Island R.R.*, 729 N.Y.S.2d 301, 304 (Sup. Ct. 2001) (internal citations and quotation marks omitted):

> [T]he "antisubrogation rule" precludes an insurer from being subrogated to a claim against its own insured ... To allow the insurer's subrogation right to extend beyond third parties and to reach its own insured would permit an insurer, in effect, to pass the incidence of loss from itself to its own insured and thus avoid the coverage which its insured purchased.

*Wassau Underwriters Ins. Co.* v. *Gamma, USA, Inc.*, No. 708796/2015 (Sup. Ct. Queens Cty., May 6, 2016), an unpublished trial court decision currently on appeal to the Second Department. (*Id.* at 22 n.11). In point of fact, *Wassau* does not clarify the issue because in that case, the court held that the anti-subrogation rule barred an insurer's claim against subcontractors whom the insurer was obliged to defend. (Pl. Br. App. 3 ("[D]ue to Tishman's obligation to defend the subcontractors, the anti-subrogation rule bars these claims against the subcontractors[.]")). Here, in sharp contrast, Hamilton pursues a claim not against its own additional insured, but rather against the co-primary insurer of that additional insured. The difference is meaningful. The fact that Liberty Mutual's deductible would pass the cost of Hamilton's claim against Liberty Mutual on to Gilbane does not mean that Hamilton is pursuing a claim against Gilbane.

In sum, Hamilton's arguments in favor of set-off, while thoughtful, are unable to overcome the deductible endorsement to the Liberty Mutual Policy. As such, Hamilton is not entitled to a set-off from Liberty Mutual for its costs incurred in defending DASNY.

## CONCLUSION

For the reasons stated in this Opinion, Plaintiff's motion for summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED. The Court ORDERS that Defendant reimburse Plaintiff in the amount of $145,263.30, plus interest at 9% per annum from December 13, 2013.

In its motion for summary judgment, Plaintiff requests the award of attorney's fees. If Plaintiff persists in this request, the parties are ORDERED to meet and confer on the issue in the 30 days following the issuance of this Opinion. If the parties are unable to come to agreement on this issue, counsel for Plaintiff is ORDERED to file a letter on or before **January 18, 2019**, proposing a briefing schedule.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      December 11, 2018
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge